Sun Constructors Inc. May it please the Court, Good morning, Charles Angerman on behalf of Sun Constructors Inc. I would like to reserve three minutes for rebuttal. Granted. The second question before this Court is whether under Virgin Islands law are all contracts unenforceable if the contract is written in English and signed by someone who speaks Spanish. That is the proper question. The answer is simple and it's no. The contracts in Virgin Islands law are not unenforceable if they're written in English and the person who signs them is Spanish. Isn't there an underlying question whether someone in the position of your client has the obligation to ensure that people signing agreements of this type understand? Right. The Federal Arbitration Act states that agreements to arbitrate are valid, irrevocable, and enforceable as a matter of law save upon such grounds as existent law or inequity for the revocation of any contract. Any contract. So the fact that this is an arbitration contract does not hold the parties to a higher standard for enforceability. And the District Court erred below by holding the parties to a higher standard. As Judge Rendell just stated, that what they asked to do is for Sun to be able to come in and prove that this person could understand the contract. But to have a contract, you have to have a meeting of the minds. Right. Particularly as to all relevant portions of the contract. Right. And the District Court said there was no meeting of the minds as to the arbitration clause. It didn't invalidate the whole contract. It invalidated the enforceability. Or he refused to enforce the arbitration clause because there was no meeting of the minds as to that. Right. And there was no meeting of the minds, not because the individual signing the contract did not have an opportunity to take the contract, to get it reviewed, to get it translated, to make sure that they understood what all the terms are. The law presumes that somebody... Well, I don't know. You might have a different case if Sun had said, here's the contract. It's in English and you don't speak English. Go find somebody to translate it for you and then sign it on your own if you like. But that's not what happened in this case. What happened in this case is that Sun provided an interpreter or translator. Right. Sun asked another applicant that it knew understood English and understood Spanish to help the employee fill out the form. Sun was not obligated to do that. Because this is an arbitration agreement, Sun was no more obligated to do that than it would be when Andy had a coat check at a hotel. Was there pressure to have him sign right away to get him out there? The pressure... According to the plaintiff, according to Mr. Morales, that Sun was under the pressure. There was no pressure from him, but that Sun wanted to get him out there. He didn't testify, though. He said, sign it, sign it, just sign it. They said, sign here, sign here, sign here, sign here. This orientation took two and a half hours. They were explaining all the documents. They had somebody there that could explain it, that understood 85% of it, that was a high school graduate in the Virgin Islands, and all of that is in the record, that he understood English, he understood basically what was going on, he explained what was going on. What happens if you don't sign? You don't work? Correct. This is the condition of employment. And you don't get paid your $19 an hour. In this case, the gentleman signed a contract in April of 2004. He worked for the company for a year under that contract, earning $19 an hour to provide welding services at the refinery. He earned approximately $40,000 under that contract. He never asked for a copy of the contract? Never asked for a copy of the contract at any time during his employment. What is your response to the argument that he had no idea there was an arbitration clause in the contract and no idea that he received an incomplete translation? That would be his obligation to ensure that he understood what he was signing and that he understood that the document was going to be binding upon him. Do you think that obligation changes when someone undertakes to translate a document for the non-English speaker? Unless the law really is that no good deed goes unpunished. No, I don't believe that it does change the standard. Unless there was a finding of fraud or an allegation of fraud, if we came in, if the testimony was that we told him that he was signing for the coat check when he was really signing an arbitration agreement and that we did that intentionally to deceive him, yes, at that point the contract would be unenforceable, any contract would be unenforceable under the grounds that are assisted law or equity. Is that the issue? The issue really is whose burden is it? Is it the company's burden to make sure that he understands or is it his burden to make sure that he is understanding everything that's in there? I agree that that's the question. The answer to that is simple, that it is not the company's burden. It is never party to the contract's burden to prove that the other side understood the contract. If somebody signs, and again, this is a 12-page contract, he signed and at the last page, he initialed each page. Two and a half hours, they talked about all of the documents. The testimony is clear and unrebutted that Mr. Langer, the safety manager and HR manager for the company, explained what arbitration meant, that you were giving up your right to trial, you have to go to arbitration. The testimony is clear and undisputed that Mr. Hodge translated what was being said during their orientation. Again, that is in the record. Now, there's something that he took an examination and passed in English? Correct. All we're saying is that we don't concede that Mr. Morales didn't understand English. There is what's called the ADI test. The ADI test, he testifies, was in English, that he took it, that he passed it. That was another requirement of employment. He took that with him. And his testimony in the deposition is that no one translated that for him, and he was able to take and pass that. That's mysterious. We don't know how it happened. But for purposes of this appeal, you're not... We're not contesting that he can't understand English because that's not our burden, we believe. We believe that any contract in the Virgin Islands is valid and enforceable if it is signed by the individual, that the burden is on the individual. And this case law goes back to the 1800s and before, that a party is bound to a contract that it has signed, whether he chose not to read it, whether he could not read it because of illiteracy, whether he could not read it because it was written in a foreign language. What are your best cases? I think the American Heritage Institute, the circuit case, would be the best case. And the other cases that we cited, and going back, if someone can come into court and say, look, I didn't understand what I signed, it doesn't matter if he didn't understand it because of his education level, this court cannot have two levels of enforceability, one for the educated, one for the not. I think you're right about that, what you just said. But the problem that I have is when the employer undertakes to translate a document and then fails to translate a very important provision in that document, I wonder if the district court was quite correct to say that there was no meeting of the minds in light of what occurred in this particular case. The question that the court asked in this particular case was as to one paragraph of a 12-page document. The court asked, turning to paragraph 14, did you translate that specifically? This is on page 94 of the appendix. That one paragraph, which is found on page 133 of the appendix, is one half of a 12-page document. There were five separate paragraphs on arbitration. What the testimony above was, that this orientation takes two and a half hours, that Mr. Langer was going through and explaining each page, page by page of the contract, and that Mr. Hodge was doing his best to explain that to the individual. But again, without him finding a fraud on behalf of the employer that we were telling him something that wasn't true, that we were intentionally misleading him as to what was in the document, there is no basis for failing to enforce this contract. The court below basically was saying, because this contract is an arbitration agreement where you are waiving invaluable legal rights, we're going to hold you to more. And that, Your Honors, is what this court has repeatedly found to be improper, what the Third Circuit has found to be improper, and unfortunately what this judge has been doing on a regular basis. You're familiar with the American Heritage case versus Langer and the Fifth Circuit? Yes. That does indeed invalidate a contract because the worker was unadvised in the arbitration. Well, what happened there was... Why is that case not applicable? That case is applicable here, and what it found is that the literacy alone is not sufficient. What the facts were, what the allegations were in that case, is that they had told him he was signing something different and that there was fraud in the inducement and that the court said without fraud, the literacy doesn't get you there. You need to have both. I mean, it's not fraud if you can read it and you just chose not to because there wouldn't be any detrimental reliance or any reasonable reliance on the statements made by the other party in this case. But in this case, there was no allegation at all that we told him anything improper. What they're saying is that we didn't meet our burden to show that we told him everything and we explained it in sufficient detail and we had somebody who was sufficiently knowledgeable about it and understood it sufficiently. That type of a heightened standard is inapplicable to any contract and therefore cannot be applied to an arbitration agreement. And it was applied to an arbitration agreement simply because it was an arbitration agreement that is waiving, quote, valuable legal rights. The district court didn't go into the concept of having volunteered cannot now say that there was no understanding. In other words, the district court really did go against the Fifth Circuit case and said there needs to be a meeting of the minds. Before we had the hearing, before the court, the district court had an order that said given the American Heritage case, please come in and put on evidence concerning the fraud, really. But at the hearing, the plaintiff's counsel was kind of very succinctly and clearly stated fraud's not the issue here. It's simply that he doesn't understand English. There was no meeting of the minds. The court has to and the law has to assume that if someone signs a written contract that they understand and are going to be bound by the terms of that written contract absent something that will waive the enforceability of any contract. And again, that would be fraud, duress, mutual mistake, there's no mutual mistake here, coercion, something along those lines. And the facts here are the only person that had the power here was Mr. Morales. The testimony was we needed to get a welder out in the field and that we were going to do what it took to get a welder out in the field, that we were having pressure from our employer, from our contractor or the owner of the facility to get out there. If Mr. Morales didn't feel comfortable with what he was signing, he could say hold up, I'm not going to sign this. I don't know what it means. I'm not sure Mr. Hodge is a good enough translator. What if the employer says look, we'll take care of the translation for you. We need you right away. We're really hurting for a welder. He still has the obligation before he signs something to understand what it is that he signs unless there's some fraud on our part. Even if the prospective employer says we'll do it for you, we need a welder right away, the obligation is on Morales to say thank you but I'm going to go get my own translator. Yes. If he is signing a contract, whether it's an arbitration agreement, whether it's an employment contract, if we were to turn around and say wait, we mispaid you. We should only pay you $15 an hour. Please give us back the extra $4 an hour we paid you. I think he'd be waving the contractor around saying no, you promised to pay me $19 an hour. Thank you. No further questions? Take my mic. May it please the Court. Good morning, Your Honors. My name is Emilio Henderson III with the Law Offices of Yvette Ross Edwards and I represent the appellee plaintiff in this matter, Mr. Juan Morales. Your Honors, the issue in this case is one where was there a valid contract? Specifically, was there a meeting of the minds? There is, of course, the sub-issue as to how or whether or not the parties have gone to that issue of the meeting of the minds. The federal policy favoring arbitration does not apply to any determination as to whether or not there is a valid agreement to arbitrate between parties. Instead, what we must look at is ordinary contract principles to determine who is bound to any specific contract. Why isn't Mr. Engleman right that it was Morales' responsibility to make sure that he understood the terms of the contract before he signed it? Mr. Engleman is incorrect in that, as you specifically pointed out, Judge Prentiss, Sun undertook that obligation to explain a document prepared by Sun, all in English, have him go through a two-and-a-half-hour orientation all in English. Sun, in addition, did not bring in a translator that they knew was familiar with arbitration clauses or that worked specifically for Sun. They went ahead and got a person who was also applying for a job and said, hey, can you translate that for us? Well, they didn't say that specifically. It's like, will you help him? I'm sorry? I don't know that there was a statement that they said they got someone to translate, but someone to help him. I'm sorry, you're correct, Judge Prentiss. It was someone to help him along through the process. And Morales testified that he, in other situations, when he didn't understand or needed someone, he took documents to other people to have them translated. Did he not? That is correct, Your Honor. And yet he didn't avail himself of that. In this case, Your Honor... He didn't even get a copy of the agreement. I'm sorry? He didn't even get a copy of the agreement. He did not get a copy of the agreement, Your Honor. The agreement had to be signed in the room at the time right after the orientation for purposes of the employment, which is why... That's not correct. In the record, the testimony from Sun was that if he had asked to take the document to have someone look at it, translate it, they would have allowed that. And, Your Honor, it is our position that that statement was as a direct result of what had already occurred, the fact that he has now filed this action. There was no indication throughout the entire two-and-a-half-hour process that indicated if he would like to take this contract out to go and have it reviewed by someone else, you may do so. But there's also nothing in the record that says that he couldn't have done that or was told that he could not do that. That is correct, Judge Randolph. I just want to make sure of that. When Sun undertook that responsibility to have Mr. Hodge help him, help Mr. Morales, or translate certain documents, as the record indicated, Mr. Lanier testified, that he was not even aware of what was being translated to Mr. Morales or if the arbitration agreement was even being translated to Mr. Morales. In fact, the testimony by Mr. Hodge was that he understood about 85% of what was explained to him in English, and then he then attempted to explain to Mr. Morales, specifically under the court's questioning as to whether or not he explained the arbitration clause to Mr. Morales, he emphatically stated he did not. Mr. Morales was not aware that there was even an arbitration clause within the document. Let me ask you, what if this other gentleman didn't exist at all, Mr. Hodge? Would that help your case or hurt your case? If Mr. Hodge did not exist, my understanding based on prior experience, Mr. Morales, of course, would have, or at least would have requested further assistance in that. In this case, he didn't have the opportunity to request any further assistance because the assistance was provided for him. Well, that was a good question, though. Mr. Morales would be stuck, wouldn't he? If there were no Hodge around, no one who could help him understand the terms of the contract. Mr. Morales would be stuck if he on his own went out and just took the agreement, looked at it, and signed it, and just sent it off. That is correct. However, that is not what occurred in this case. In fact... Who presented Mr. Hodge to Mr. Morales? Some constructors presented Mr. Hodge. Mr. Morales did not turn around and say, oh, Mr. Hodge, I know that you speak English and Spanish. Would you please explain this to me? Some constructors presented Mr. Hodge to Mr. Morales, and as such, Mr. Morales would have had every right to rely on the B translation being provided to him. Some constructors specifically also argue that he did not ask any questions about the arbitration agreement. Now, based on the record that is clear, Mr. Hodge never explained to him the arbitration agreement, and therefore, he would have had no cause or reason to ask a question about it because he wasn't aware that it existed. The arbitration provisions were about... were over half of the contract, weren't they? I mean, if arbitration... shouldn't he have said, what does this say, and what does this say? You know, is there going to be documentation? Your Honor, looking back at the case at this point, when looking at a specific individual who will be speaking the language in which the contract is prepared, in that situation, I would say maybe at that point, he may be able to ask certain questions about certain things. However, in this case, where he does not speak the language at all, and he is provided with an interpreter to explain it to him, he has every understanding that what is being explained to him is in fact the entire document. So, the fact that there was a large portion of the charge... But what about the conclusion? I mean, he did talk a part of it. Where in the record is the point that statement is? He assumed it was everything? He assumed the entire contract was discussed? Well, no. Your Honor, not specifically in the record. What it is, is the... or any individual who is having something interpreted to them, specifically, and it's brought by an individual for whom the company they're going to work for, it is presumed that the individual would be able to understand that what is being explained to them as far as this document is concerned is the document in its entirety. And as such, Mr. Morales would have had every right to rely on the interpretation given to him that this is in fact the document in full. Mr. Morales does not speak English, so looking at two or three pages of arbitration agreement is of no moment to him. It's written all in English. And what could have been explained to him directly may have very well been what he was looking at and have no reason to go in and specifically ask about this specific section or this point section. And that is what the basic issue here is in this case, which the Garza-Nunez case talks about specifically, which is our point here, is that where the company provides this individual, Mr. Morales would have had a right to accept what was being pushed forth before him as being full and complete. And where he was not even aware that there was an arbitration clause in place, there could not have been a meeting of the minds between the two to arbitrate. Because in that case, talked about the medical problems of Garza-Nunez and the fact that he had no bargaining position and a lot of that went off on the total inequity of the bargaining position and the positions here. If anything, Mr. Morales was in a superior position because they desperately needed him. And if he had said, wait a minute, I really need to understand this, I need a couple of hours to go have somebody translate this, they wouldn't have said, well, we'll go on to the next guy. They needed him. Well, Your Honor, why have the Garza-Nunez case talk specifically about other experience practices with his medical condition and pain while that is not specifically in this case? The tenant, although the crux of that case, is also within this case. In that, some constructors is an employer in the Virgin Islands within the large refinery that we have there in the territory. Mr. Morales could not work at that refinery or for some constructors, but for signing this specific agreement. Yes, Mr. Morales was needed by some constructors. However, whether he was then placed on a higher bargaining power simply because they needed him, I don't believe rises to the level at this point. What it is is some constructors specifically, or they knew that Mr. Morales did not speak the English language. They were aware of that. They undertook that responsibility and obligation to provide him with a translator or an interpreter to interpret the documents They weren't even aware of what was being translated to him specifically with regards to this document. Today, some constructors cannot come in and say, well, it was his obligation to do that when they undertook that obligation for him. You don't disagree with Mr. Engman's fairly broad statement that the Virgin Islands should have two standards, one for English-speaking persons and one for non-English-speaking persons when it comes to contracts? Absolutely not, Your Honor. The public policy of the Virgin Islands is that contracts should be knowing and voluntary. So you're seeking to carve out an exception to that general rule? Your Honor, I'm not sure that it's specifically an exception. I'm asking this court to enforce the basic tenet that where there is no mutual assent with the parties to a specific issue to a contract, it's not going to be enforceable. In this case, the only thing that makes it somewhat a little bit different is that you have an individual that did not speak the language in which the contract was prepared, that the employer or the potential employer knew that he did not speak that language, and that that potential employer took it upon its own volition to accept that obligation to present him with someone  without securing whether or not the full document was ever being translated to him to ensure that that individual and what they thought their minds met. What if the person can't speak a word of English and just signs blindly a contract? Do you have mutual assent? In that case, Your Honor, the standing principles that is listed as to an individual who just blindly goes in without having to read a contract... He doesn't care. He just wants the job. He signs it. He'll sign anything you give him. Just signs. Well, in that case, Your Honor, again, if he still doesn't know what's in there, there is no mutual assent. However, the fact that he has signed the document, he's waiving and availing himself to that contract and cannot then turn around and claim that he didn't know it. Should that person be held to a standard that you assented, you had a chance to go get the contract interpreted or translated, and you did not, so... That individual... Too bad. He probably should be held unbound to it. However, that's not the individual in this case. That is correct, Your Honor. Right. They knew of the limitations and they undertook that obligation to provide him with this translator or this interpreter and as such, in taking that obligation, they were under that duty to ensure that he understood what they understood. And when they failed to do that, then again, there was no meaning in their minds to create this valid contract. And under the specific virginality principles on contract formation, the meaning of the lines is a necessary and essential element for any contract. And the lower court was correct in not enforcing the specific arbitration agreement in this case, and this court should also do the same. Your Honor, I see I'm out of time, so may I briefly conclude on this? Yes, please. Your Honor, consent is a very necessary element of whether a valid contract exists within the... and that consent must be knowing and voluntary. The virginality public policy requires that the neutrality be present. Some constructors undertook that obligation to provide Mr. Morales, in this case, a person they knew did not have an understanding of the English language, to provide him specifically with that information. And as the record is clear, Mr. Morales was never explained in the arbitration clause. And as such, there was no valid contract because there was no neutrality of assent. And we ask that this court affirm the lower court's decision. Thank you, Mr. Morales. The first line of the contract, across the top of the document, written in bold, underlined, this is an important legal document. That's the first line of the contract. We weren't hiding anything from Mr. Morales. The question here is, how do we prove assent? We prove assent because he signed the contract. That is what you prove assent every time that they did the thing that was required under the contract. They signed the contract. We do not have to prove that they understood it. As the law has long held, if we have to come in, if a person can sign a contract and be bound by it, but then come into court when he's held to his end, meaning he can receive all the benefits of the contract, he got paid $19 an hour, he got the job at the refinery, he was allowed to do this stuff, only when he gets terminated for knocking a bottle of urine a great distance onto people down below, creating a safety hazard, does he say, wait a minute, I never agreed to arbitrate. That's not the law of the Virgin Islands. It's not the law of the United States. Does it matter whether Hodge was an agent of Sun or not? Unless there is a claim of fraud. Unless they are saying that we did something to mislead him as to what he was signing. If there's an allegation of fraud, then yes, you have to tie that to Sun, that Sun engaged in the fraud. Again, this can't be a no good deed goes unpunished. We try to help him out. We try to give him the information. If he wanted to take it, he could take it. If he asked questions about it, they would have been answered. That is in the record. If he wanted, if he asked any questions, what would you have done? We would have explained it further. Was he an employee at Will? Under Virgin Islands law, for the first six months, yes, he would have been an employee at Will. Except, no, actually, the contract, no, he's an employment contractor. The contract provides for pause termination. So actually, he had more benefits than he would have had under the employment at Will contract. Let me ask you, let's say he just wanted to get out there and start his welding, right? He takes it home and then has his lawyer look at it the next day. Couldn't he just say, I quit. I'm not going to work under these circumstances. If you want to modify this, I'll come back. He was free to leave. He could have negotiated any term. He could have said, look, I mean, and again, with Sun, his argument is that we needed him, that we were desperate to get him out in the field. There's no evidence or record that would say that we would not negotiate different terms of the contract for him. But even if we weren't, it was his obligation to understand what he signs. He failed to read it. And in the cases Judge Fuentes had asked me earlier, some of the other ones, the paper express case from the Seventh Circuit, parties should be held to the contract, even if the contract's in a foreign language. The district court in Booker versus Robert Happ International, all in our briefs, again, indicating that the fact, whether the contract's in this language of the one party contract or not, the law is the same. And again, the Federal Arbitration Act, which governs this matter, it has to be revocable, same on any grounds that would exist, contract or in equity, or in law or in equity, for any contract. So the fact here, again, that they look at that it was an arbitration agreement giving up value of legal rights is an indication that they were holding this contract to a higher standard. We would request that the court reverse the decision below and enforce the arbitration agreement. I think the case is very well argued. We'll take it for advisement. We'll call our last case of the morning, Centillon versus Charmoux et al.